668 A.2d 491

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Aaron JONES, Appellant.**

Supreme Court of Pennsylvania.

Argued April 26, 1995.

Decided Nov. 22, 1995.

Reargument Denied Jan. 16, 1996.

470

476

Gerald A. Stein, for Aaron Jones.

Catherine Marshall, Norman Gross, Robert A. Graci, Attorney General's Office, for Com.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION

CASTILLE, Justice.

Following a nine (9) day jury trial in which appellant was tried with co-defendants Samuel Brown and James Anderson, appellant was found guilty of first degree murder [1] and criminal conspiracy to commit murder [2] in connection with the August 18, 1990 death of Brian Kennedy. The jury acquitted appellant of the three counts of aggravated assault which were also charged in connection with this incident. [3] With the agreement of the parties, the trial court then ordered that appellant's penalty hearing be severed from that of the other two co-defendants. Following the penalty hearing, the jury found that one aggravating circumstance [4] outweighed the one mitigating circumstance, [5] and set the penalty at death. [6] Post-

1. 18 Pa.C.S. § 2502(a).

2. 18 Pa.C.S. § 903.

3. Co-defendants Samuel Brown and James Anderson were also convicted of first degree murder and conspiracy to commit murder. Like appellant, these two co-defendants were acquitted of three counts of aggravated assault in connection with this incident. However, these two co-defendants were also convicted of possessing an instrument of crime generally.

4. The one aggravating circumstance unanimously found by the jury was that defendant had been convicted of another federal or state offense for which a sentence of life imprisonment was imposable. 42 Pa.C.S. § 9711(d)(10). Specifically, appellant was sentenced to a mandatory term of life imprisonment in 1992 by the United States District Court for the Eastern District of Pennsylvania because appellant was the leader of the JBM (discussed *infra.* at n. 8) and his involvement as leader of the JBM resulted in his conviction of engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848.

5. The sole mitigating circumstance found by the jury was any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense. 42 Pa.C.S. § 9711(e)(8).

6. In their separate penalty phase hearing, co-defendants Samuel Brown and Christopher Anderson were each sentenced to life-imprisonment.

verdict motions were filed and these motions were denied. On February 28, 1994, the trial court imposed the jury's sentence of death.[7] This direct appeal followed. For the reasons expressed herein, we affirm the judgment of sentence imposed by the Court of Common Pleas of Philadelphia County.

## I. *SUFFICIENCY OF THE EVIDENCE*

As is required in all cases where the death penalty has been imposed, this Court must conduct a review of the sufficiency of the evidence. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26, 454 A.2d 937, 942 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). When reviewing a sufficiency of the evidence claim, an appellate court, viewing all the evidence and reasonable inferences therefrom in the light most favorable to the Commonwealth as the verdict winner, must determine whether the evidence was sufficient to enable the fact finder to find that all of the elements of the offenses were established beyond a reasonable doubt. *Commonwealth v. Burgos*, 530 Pa. 473, 476, 610 A.2d 11, 13 (1992). Using this standard, the record below establishes the following evidence:

Appellant and the two co-defendants in this case were members of an organization known as the JBM.[8] The JBM was an organization which distributed drugs within the city of Philadelphia. In 1990, appellant was the leader of the JBM. Co-defendant Samuel Brown was also a member of the JBM and was approximately third in command. The other co-defendant, James Anderson was a member of the organization who worked as a bodyguard for Leroy Davis, the person who led the Southwest Philadelphia faction of the JBM.

7. With respect to appellant's conspiracy to commit murder conviction, the trial court entered a verdict of guilt without further imposition of sentence.

8. The initials JBM were often referred to as standing for the appellation "Junior Black Mafia."

In May, 1990, Davis was slain. Rodney Carson,[9] a Commonwealth witness, testified that he had informed appellant that he suspected that Brian Thornton, another high ranking JBM member, had murdered Davis. Appellant initially disbelieved Carson's suspicions but ultimately changed his mind, convinced that Thornton had killed Davis.

Because of appellant's belief that Thornton killed Davis, a meeting was held on August 17, 1990 in the dining room of a house at 46th and Woodland which belonged to Calvin and Mark Brown. Appellant, together with co-defendant Samuel Brown, Christopher Anderson, Calvin and Mark Brown, and Bernard Fields Quadir were present at this meeting. Christopher Anderson [10] testified at trial that since Thornton was incarcerated when this meeting occurred, the meeting concerned who they could "hit" to avenge Davis' death and to also send a message to Thornton that the killing of a fellow JBM member was not condoned by the JBM or its leaders. Appellant decided that they would kill Thornton's cousin, Bruce Kennedy,[11] and that Christopher Anderson and James Anderson would execute the murder.

Immediately after the meeting, appellant, co-defendant Brown, Christopher Anderson and two other people at the meeting went to a bar called Tucker's on 54th and Greenway in Southwest Philadelphia to meet co-defendant James Anderson and inform him of his mission. When they arrived, appellant pulled James Anderson aside and co-defendant

9. At trial, Rodney Carson testified for the Commonwealth pursuant to plea agreements with Commonwealth and federal authorities. Rodney Carson had yet to be sentenced as of the date that he gave his testimony in this trial.

10. Christopher Anderson admitted participating in the murder of the victim. He testified at trial pursuant to a plea agreement with the Commonwealth. In connection with this incident, Christopher Anderson pleaded guilty to third degree murder, aggravated assault and conspiracy to commit the murder. On November 4, 1991, before this trial began, a state court sentenced Christopher Anderson to a sentence of thirty-two and one-half years (32½) to sixty-five years.

11. The victim, Bruce Kennedy, also had been sexually involved with a woman named Neisha Witherspoon. Witherspoon had a prior relationship with appellant that produced one of appellant's sons.

Brown informed James Anderson of the plan to murder the victim at his store, a small convenience store called "Mommies" at 54th and Harlin Streets in West Philadelphia. Co-defendants Brown and James Anderson, along with Christopher Anderson, then drove to the victim's store to plan the logistics of the murder. Later that evening, appellant instructed co-defendant Brown and Christopher Anderson to obtain a car from a person named "Eggie" to use in the murder so that the car could not be traced to anyone in the JBM.

On August 18, 1990, the day of the murder, co-defendant Brown instructed Christopher and James Anderson to obtain black sweat suits, which they did. Co-defendant Brown also supplied them with black leather gloves. To carry out the assassination, Christopher Anderson armed himself with a nine millimeter semi-automatic handgun provided by co-defendant Brown. James Anderson armed himself with a nine millimeter MAC–11 machine gun.

James Anderson and Christopher Anderson then drove to the victim's store in the car provided by Eggie. They initially proceeded into the store at approximately 4:10 p.m. to see if the victim was present. After determining that the victim was present, the two Andersons left the store and returned to the car to don their hooded sweat suits and gloves and to arm themselves for the murder.

The Andersons then returned to the store at approximately 4:20 p.m. The victim was in the rear of the store. Three of the store employees were working in the front of the store. James Anderson pulled the MAC–11 from under his sweat suit and proceeded to the back of the store where he killed the victim by firing at least ten shots into his body. Upon hearing these shots, the three workers fled from the store at which time Christopher Anderson fired upon them hitting one of them in the shoulder.

After the shooting, James Anderson and Christopher Anderson abandoned their car and discarded the firearms and clothes near train tracks by the Philadelphia Zoo. James

Anderson then called Carson to pick him up at 29th and Girard in Philadelphia. Carson testified that when he met and picked up the two Andersons in his car, that James Anderson informed him how they had killed the victim.

Christopher Anderson further testified that later on that evening he informed co-defendant Brown that police were seen near Anderson's mother's house. Accordingly, co-defendant Brown took Anderson to see appellant Jones about seeking refuge. Appellant told Brown to take Christopher Anderson to a certain hotel and gave him money to pay for the hotel. Co-defendant Brown took Christopher Anderson to what was known at that time as the Airport Tower Hilton. Brown registered for the room under his own name and signed the registration card.[12] It is there that Christopher Anderson hid until the next day.

In first degree murder cases, the Commonwealth must prove that the defendant acted with a specific intent to kill, that a human being was unlawfully killed, that the person accused did the killing, and that the killing was done with deliberation. 18 Pa.C.S. § 2502(d); *Commonwealth v. Mitchell*, 528 Pa. 546, 550, 599 A.2d 624, 626 (1991). The use of a deadly weapon on a vital part of the body is sufficient to establish the specific intent to kill. *Commonwealth v. Meredith*, 490 Pa. 303, 311, 416 A.2d 481, 485 (1980). Moreover, all co-conspirators to a murder can be found guilty of first degree murder, even if the co-conspirator did not inflict the wound which resulted in death. *Commonwealth v. Joseph*, 451 Pa. 440, 449, 304 A.2d 163, 168 (1973).

Here, the evidence presented at trial showed appellant was the member of the conspiracy who devised the murderous plot and ordered his co-conspirators James Anderson and Christopher Anderson to carry out the plot. In accordance with these orders, James Anderson and Christopher Anderson

12. Christopher Anderson's testimony was corroborated by the hotel registration card that was authenticated at trial by the night auditor on duty the night of the murder. The registration card showed that on August 18, 1990, co-defendant Brown registered for room 515 at a rate $75 a night and that he paid for the room in cash.

went to the victim's store and murdered the victim by shooting him at least ten times. This evidence was sufficient to establish beyond a reasonable doubt that appellant, in a conspiratorial fashion, acted with malice aforethought and with a specific intent to kill. *See Commonwealth v. Boyle,* 470 Pa. 343, 368 A.2d 661 (1977) (evidence that defendant was member of conspiracy to kill three persons was sufficient to support guilty verdict against defendant in prosecution of three counts of first degree murder).

## II. *MOTION FOR SEVERANCE*

Turning now to appellant's claims, he first contends that the trial court erred in denying his motion for severance. Appellant submits that the trial court's denial of his motion for severance prejudiced him because his co-defendants pursued antagonistic defenses which relied, in part, upon evidence regarding the JBM's other criminal acts and functions in an attempt to portray themselves as insignificant foot soldiers who were only following appellant's orders. Appellant also asserts prejudice based upon his belief that if a severance had been granted, no testimony would have been presented concerning the hierarchy of the JBM or that appellant ordered others to murder the victim.

A motion for severance rests within the sound discretion of the trial court and will only be reversed on appeal for a manifest abuse of discretion. *Commonwealth v. Jones,* 530 Pa. 591, 602, 610 A.2d 931, 936 (1992). As a general policy, joint trials are encouraged when judicial economy will be promoted by avoiding the expensive and time-consuming duplication of evidence. *Commonwealth v. Patterson,* 519 Pa. 190, 197, 546 A.2d 596, 600 (1988). Where, as here, defendants have been charged with conspiracy, joint rather than separate trials are preferred. *Commonwealth v. Jackson,* 451 Pa. 462, 464, 303 A.2d 924, 925 (1973). However, severance may be proper where a defendant can show that he will be prejudiced by a joint trial. *Jones, supra.*

486

■■■■■■ While the possibility of conflicting or antagonistic defenses is a factor to be considered in determining whether to grant a motion for severance, appellant must show a real potential for prejudice and not just mere speculation. *Id.;* *Patterson,* 519 Pa. at 197, 546 A.2d at 599. The fact that hostility exists between the defendants or that one defendant may try to save himself at the expense of the other constitutes insufficient grounds to require severance. *Jones, supra.* Moreover, the mere fact that one defendant might have a better chance of acquittal if tried separately is an insufficient ground to require severance. *Patterson,* 519 Pa. at 197, 546 A.2d at 600. Further, defenses only become antagonistic when the jury, in order to believe the testimony offered on behalf of the one defendant, must disbelieve the testimony offered by his or her co-defendant. *Commonwealth v. Chester,* 526 Pa. 578, 590, 587 A.2d 1367, 1373, *cert. denied,* 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991).

■■■■■■ Here, the three defendants were charged with conspiracy, making a joint trial advisable. Almost all of the evidence presented at trial pertained to all three defendants rather than just one. While portions of the testimony elicited by appellant's co-defendants did relate to prior crimes committed by the JBM,[13] the record indicates that appellant did not object to this testimony until the next day when he requested the severance. However, much of the prejudice was cured by adequate cautionary instructions given by the trial judge earlier during Carson's testimony that was designed to coun-

13. The evidence of prior JBM activities came during Carson's cross-examination. Carson was asked about the existence of the JBM's drug network throughout Philadelphia as well as the hierarchy and benefits of membership in the JBM. Carson was also asked about his feelings on Davis' murder as well as his knowledge of the murder of another person, Franklin Egypt. (N.T. 1/12/93, 230–39). This testimony was pursued by appellant's co-defendants in an attempt to cast doubt on testimony elicited during direct examination by the Commonwealth. This testimony was also pursued in order to advance an alternative motive for the victim's death, i.e., that Carson sought to avenge Davis' death without the aid of the defendants' involvement because of Carson's personal anger over the Davis killing.

ter any possible prejudicial effect on appellant.[14] Also, a review of the record indicates that all defendants basically pursued a common defense strategy of attacking the credibility of the Commonwealth's witnesses. Such a unified strategy does not represent the type of antagonistic or conflicting defenses which would mandate a severance. Moreover, a severance would not have insulated appellant from evidence about the hierarchy of the JBM or that he ordered the victim's murder since such evidence was admissible to show appellant's participation in the conspiracy and motive to murder the victim. Finally, the trial in this case was a lengthy one. It consisted of three days of voir dire and nine days of testimony and argument before a verdict was reached. Twenty-three (23) witnesses testified at trial and this testimony produced a large record. To have conducted separate trials for each defendant would have placed a heavy burden upon the judicial system as well as the public. Accordingly, since appellant cannot show the level of prejudice required for us to find that the trial court abused its discretion in denying his motion for severance, this claim must fail.

## III. *MOTION IN LIMINE*

Appellant's next claim is that the trial court erred in denying his motion in limine to prevent the Commonwealth from presenting evidence concerning the JBM's structure and activities. Specifically, he argues that the evidence at trial that appellant was the leader of the JBM, that the JBM was an organization involved in dealing drugs in Philadelphia, and that appellant ordered two other JBM members to murder the victim so that the JBM could avenge the murder of Davis (another JBM member) and send a message to Davis' murderer, served no purpose other than to arouse the passion and prejudice of the jury. However, evidence of appellant's involvement and relationship with the JBM, as well as the

14. For example, the trial court stated: "Members of the Jury, the JBM is not on trial. The only reason the words even come into trial is because its [sic] a possible motive. It is up to you to assess the credibility of these witnesses as to the reason why things happened and that is it. (N.T. 1/12/93, 87).

JBM's hierarchy and general activities, were admissible to prove the motive for the victim's murder and the existence of a criminal conspiracy. *See Commonwealth v. Reid*, 537 Pa. 167, 181–82, 642 A.2d 453, 461, *cert. denied*, —— U.S. ——, 115 S.Ct. 268, 130 L.Ed.2d 186 (1994) (evidence of appellant's connection with JBM admissible to prove motive and conspiracy in prosecution for murder in the first degree in connection with murder of victim who stole JBM drugs); *Commonwealth v. Gwaltney*, 497 Pa. 505, 513–14, 442 A.2d 236, 240–41 (1982) (evidence that appellant was member of a gang and that a member of appellant's gang was stabbed by the deceased, who was a member of a rival gang, admissible to prove criminal conspiracy and motive for murder). *Accord, United States v. Eufrasio*, 935 F.2d 553, 573 (3d Cir.1991) (trial court did not abuse discretion in denying defendant's motion in limine to exclude evidence of uncharged "MAFIA" crimes in prosecution for racketeering and conspiracy since such evidence demonstrated history, structure, internal discipline of enterprise, regular means by which enterprise conducted business, and respective roles of captain and subordinates within crime organization). Moreover, the trial court consistently took steps to limit any prejudice appellant may have suffered from the introduction of JBM evidence by not allowing the Commonwealth to introduce specific details of other JBM crimes or criminal activities and by consistently instructing the jury that the proffered JBM evidence was only relevant to prove motive rather than the propensity to commit the charged crimes. Accordingly, this claim must fail.

## IV. *MOTIONS FOR MISTRIAL—ADMISSION OF PREJUDICIAL TESTIMONY*

Appellant's next claim is that the trial court erred in denying his numerous motions for a mistrial and that he, therefore, is entitled to a new trial as a result of the admission of prejudicial testimony. A trial court need only grant a mistrial where the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. *Commonwealth v. Brinkley*, 505 Pa. 442, 480 A.2d 980, 986

(1984). A motion for mistrial is a matter addressed to the discretion of the court. *Commonwealth v. Gardner,* 490 Pa. 421, 416 A.2d 1007 (1980).

## (a) *Rodney Carson*

Appellant first alleges that Carson's testimony required a mistrial. Specifically, he alleges that there were eight instances during Carson's testimony where improper evidence was elicited or given so as to have required the trial court to declare a mistrial. His challenges to Carson's testimony will be addressed *ad seriatim:*

(1) Appellant first contends that a mistrial was warranted when the Commonwealth elicited testimony from Carson during direct examination about the meaning of the phrase "get down or lay down" which was used by JBM members. During direct, the Commonwealth initially asked Carson about the JBM's general activities. Carson testified that they were involved in distributing cocaine and heroin. After properly setting the stage, the Commonwealth then inquired into the JBM's usage of the phrase "get down or lay down" in order to expand the JBM drug network. Before Carson replied, the trial court instructed the jury that such evidence was only admissible as to motive and that the JBM was not on trial. Carson then explained that "get down or lay down" was used by the JBM to inform independent drug dealers that either they buy their drugs from the JBM or else they would be killed. Appellant's objection that this testimony improperly delved into other crimes of the JBM was sustained. (N.T. 1/12/93, 83–88).

 We first note that despite the trial court's ruling, such evidence of general JBM activities was admissible to prove the motive for killing the victim. Such evidence was admissible since it established that the JBM was a drug organization which enforced internal discipline with acts of violence and that in this instance it resorted to murder to settle an internal dispute. *See Commonwealth v. Hall,* 523 Pa. 75, 84, 565 A.2d 144, 149 (1989) (prosecution could question defendant and

490

others about defendant's past drug dealings to establish defendant's revenge motive for killing of drug dealers who recently cheated defendant in large drug deal). Since the evidence in question was admissible, a mistrial was not warranted.

Assuming *arguendo*, however, that this testimony was inadmissible, appellant suffered no prejudice from the Commonwealth's attempt to elicit testimony on the meaning of the phrase in dispute since appellant's objection was sustained. At the outset, we note that appellant did not request a mistrial when he objected. The failure to request a mistrial until after a negative verdict bears heavily on the weight of the claim. *Commonwealth v. Williams*, 541 Pa. 85, 660 A.2d 1316 (1995) (Court will not countenance trial counsel intentionally sitting silently at trial only later to complain of trial errors on appeal after negative verdict entered).

We also note that the jury was instructed by the trial court in its opening instructions that a response to a question which is objected to and sustained does not become evidence. A prompt and adequate cautionary instruction to which appellant did not object, and for which he did not request further clarification, was also given just prior to Carson's explanation in order to cure any potential prejudice.[15] This instruction, coupled with the trial court's opening instruction convinces us that a new trial is not warranted since the jury is presumed to follow the court's instructions. *See Commonwealth v. Baker*, 531 Pa. 541, 559, 614 A.2d 663, 672 (1992) (our law presumes

15. The curative instruction given by the trial court was:

Members of the jury, I have been asked to instruct you by one of Defense Counsel as to the significance of the phrase get down or lay down. Pre-trial I made a ruling and the rulings are that any reference to JBM which is not on trial in this case can only come in for one purpose and only one purpose and that's if you hear any testimony concerning a possible motive, and that's the sole limitation for this phrase coming in now. If you don't hear any evidence concerning a possible motive involving that phrase or the JBM, then I will order you to strike it from your minds. So with the preamble that the Commonwealth has represented that you will hear further evidence which you have not heard yet, so until such time as you hear it, just hold in your minds but be prepared to either accept or disregard it based on the balance of the testimony.

that juries follow the court's instructions as to the applicable law). Moreover, after considering the totality of the circumstances, we find that the trial court's instructions cured any potential prejudice. *See Commonwealth v. Morris,* 513 Pa. 169, 519 A.2d 374 (1986) (prejudice from limited reference to alleged prior criminal activity cured by immediate cautionary instruction and admonition in jury charge). Accordingly, this claim must fail.

(2) Appellant next complains that Carson should not have been allowed to testify on direct examination that appellant was the leader of the JBM and that Brown was a high ranking member. In attempting to establish the hierarchy of the JBM and the influence appellant had over his underlings, the Commonwealth asked: "and you said that Aaron Jones was the leader and Sam Brown was one of the higher members?" (N.T. 1/12/93, 97). Carson replied "yes." Appellant's objection and motion for a mistrial to this question and answer were overruled.

As previously discussed, evidence of the JBM hierarchy was relevant to prove motive in that it helped to demonstrate that the murder was carried out to avenge another JBM member's death. This information also proved the existence of the organization connecting the conspirators with the crime and with each other as well as helping establish appellant's participation in the conspiracy to murder the victim since he, as the leader of the JBM, had the ability to give orders to other individuals. Accordingly, this claim must fail since this evidence was properly admitted. *See Commonwealth v. Colson,* 507 Pa. 440, 464, 490 A.2d 811, 823 (1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986) (testimony of appellant's involvement in drug trafficking admissible to show relationship among parties involved in murder). Thus, a mistrial was not warranted and this claim fails.

(3) Appellant next claims that a mistrial was warranted because in response to the Commonwealth's question during direct examination of whether Carson was still a member of the JBM, he stated "Yes. You ain't a member—if you're a member of the JBM, the only way you ain't a member is—

there is only one way out is death." The trial court overruled appellant's objection to this testimony and denied his motion for a mistrial. However, the trial court averted any prejudice this remark had on the defendants by giving an immediate cautionary instruction that the JBM was not on trial and this testimony can only be considered to prove motive.[16] Appellant neither objected to this cautionary instruction nor did he request further clarification.

As previously stated, the jury is presumed to follow cautionary instructions and appellant's failure to object to the instruction indicated his satisfaction with the instruction. *See Morris*, 513 Pa. at 178, 519 A.2d at 378 (failure to object to cautionary instruction indicates defendant's satisfaction). Thus, under these circumstances, we do not believe that such evidence prejudiced appellant to such an extent that he was denied a fair and impartial trial. Accordingly, the trial court did not abuse its discretion in denying appellant's motion for a mistrial.

■ (4) Appellant next claims that a mistrial was warranted because Carson was allowed to testify regarding appellant's reaction to Carson's suspicion regarding who he thought had killed Davis. Specifically, appellant objects to the following exchange during direct examination:

Q: You suspected Moochie [Brian Thornton] killed Bucky Davis?

A: Yes.

Q: What did you tell Aaron Jones about that?

A: I told Aaron that it was ongoing deceit, so to speak, from Brian Thornton's point of view pertaining to Leroy Davis. What I am saying is Brian Thornton was conjuring up a lot of lies against Leroy Davis to present to Aaron Jones.

Q: You told this to Aaron Jones?

16. The trial court stated: "[M]embers of the Jury, the JBM is not on trial. The only reason the words even come into the trial is because it's a possible motive. It's up to you to assess the credibility of these witnesses as to the reason why things happened and that is it."

A: Yes.

Q: What was his reaction?

A: His reaction was this was the day he was supposed to see him. That was the day he was killed, that Sunday. And he said he's going to see him on this day to discuss all matters pertaining to—the dissension between Leroy Davis and Brian Thornton.

Q: After Bucky Davis was killed, did you have kind of a confrontation, conversation with Aaron Jones about the death of Bucky Davis and who had done it?

A: Yes.

Q: Where did that occur?

(N.T. 1/12/93, 107–08). The trial court sustained the objection to this evidence, ordered the prosecution to move its questioning onto motive, and denied appellant's request for a mistrial.

As discussed previously herein, one of the motives the Commonwealth argued was that appellant and his conspirators killed the victim to avenge Davis' death and to send a message to his murderer that Davis' death would not be tolerated. Carson's testimony concerning the death of Davis and appellant's reaction to Carson's suspicion that Thornton had killed Davis was relevant to prove the motive of revenge. Despite the trial court's ruling sustaining the objection to the evidence, we believe that this testimony was admissible and a mistrial was not warranted.

Assuming *arguendo*, however, that the trial court correctly excluded the evidence, a mistrial was still not warranted. Here, the trial court sustained the objection. As previously discussed herein, the trial court, in its opening instructions, instructed the jury that a response to a question which is objected to and sustained does not become evidence. The jury is presumed to follow the trial court's instruction. *See Baker, supra.* (our law presumes that juries follow the court's instructions as to the applicable law) Thus, based on all the circumstances surrounding this testimony, we conclude that petitioner did not suffer the degree of prejudice necessary to

494

deprive him of a fair and impartial trial. Accordingly, this claim must fail.

(5) Appellant next claims a mistrial was warranted because Carson started to testify during direct examination that appellant's statement to him that appellant was "going to take care of this matter" when discussing Davis' death meant to Carson that they were "going to kill—. Appellant's counsel objected and moved for a mistrial before Carson could testify regarding who he thought appellant was going to kill. The trial court denied the mistrial request and immediately gave a cautionary instruction that unsupported speculation on the part of the witness is not evidence.[17] As previously discussed herein, this cautionary instruction, to which appellant indicated his satisfaction by not objecting, was sufficient to remove any prejudice that appellant may have suffered so as to deprive him of a fair and impartial trial. Accordingly, this claim must fail.

(6) Appellant further argues that a mistrial was warranted after Carson testified that although he tried to convince James Anderson that the victim was not personally close enough to Thornton so that his killing would impact on Thornton, that he "guessed" that James Anderson was nevertheless "set on, you know, believing, you know, Aaron Jones, that they were close—". A review of the record reveals that appellant's counsel only moved to strike the answer and did not move for a mistrial. Thus, this claim is technically waived. (N.T. 1/12/93, 120). *See Williams, supra.* (Court will not countenance trial counsel intentionally sitting silently at trial only later to complain of trial errors on appeal after negative verdict entered). The merits of the claim similarly provides no basis for relief.

Pursuant to counsel's motion, the trial court struck this testimony and instructed the jury that "what a witness guesses is not evidence." (N.T. 1/12/93, 120). At the outset, we note that appellant fails to explain in his brief how this

17. The trial court never ruled on the objection and appellant never pressed the trial court for a ruling on the objection.

stricken answer so prejudiced him as to require a new trial or even why the prosecution's question was improper. Further, this clear instruction coupled with the trial court's instruction in its opening charge that information or testimony which is stricken is not to be considered evidence fails to provide the basis for a new trial. Under these circumstances, we conclude that the trial court's instruction sufficiently cured any prejudice suffered from this stricken testimony. *See Baker, supra.* Accordingly, this claim must fail.

(7) Appellant next contends that a mistrial was warranted because his rights under the Confrontation Clause of the Sixth Amendment of the United States Constitution were violated when Rodney Carson was allowed to testify regarding a statement by a co-defendant that they were going to kill the victim.[18] Appellant objected to this testimony and moved for a mistrial. The motion for a mistrial was denied. However, the trial court immediately gave a cautionary instruction to the jury that this statement could only be used as evidence against co-defendant James Anderson.

Appellant claims that this exchange violated the Confrontation Clause of the Sixth Amendment to the United States Constitution because it impermissibly allowed the Commonwealth to use a non-testifying co-defendant's statement as evidence against appellant in violation of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In *Bruton,* the United States Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause of the Sixth Amendment when his non-testifying co-defendant's confession naming him as a participant in the crime is introduced at their joint trial. Since *Bruton,* it has become well settled that redaction of any specific reference to defendant from the co-defendant's confession can protect the defen-

18. Specifically, Carson testified as follows:
 Q: You told us that Jamo [co-defendant James Anderson] had brought to your attention that they were going to kill Bruce; is that right?
 A: Yeah.
 (N.T. 1/12/93, 117).

dant's rights if a proper limiting instruction is given. *Commonwealth v. Wharton*, 530 Pa. 127, 139–40, 607 A.2d 710, 716 (1992); *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987).

In this case, appellant did not request a redaction and there was no need to redact the word "they" since it did not specifically refer to appellant. *See Wharton, supra.* (redaction of defendant's name to "the other guy" did not necessarily implicate defendant when two other people participated in crime and jury was cautioned that confession could only be used against co-defendant who made statement). Moreover, the trial court gave a proper cautionary instruction that this evidence could only be used against co-defendant Anderson. Thus, the testimony of Rodney Carson did not violate *Bruton. See Marsh, supra,* (no *Bruton* violation when confession did not incriminate defendant on its face).

However, assuming *arguendo*, that this admission did implicate appellant in violation of the *Bruton* rule, such error was harmless and did not prejudice appellant. Based upon the circumstances of the case, a violation of a defendant's right to confront witnesses against him may constitute harmless error if the admission could not have influenced the outcome of the case. *Wharton*, 530 Pa. at 143, 607 A.2d at 718; *Commonwealth v. Chestnut*, 511 Pa. 169, 174, 512 A.2d 603, 605–06 (1986). Here, the evidence overwhelmingly implicated appellant as the person in charge of the conspiracy who ordered the victim's murder. Thus, the admission of this exchange did not influence the outcome against appellant. *See Wharton*, 530 Pa. at 143–44, 607 A.2d at 718 (evidence of guilt so overwhelming that prejudicial effect of co-defendant's admission too insignificant to violate *Bruton* rule). Also, the exchange at issue did not warrant a mistrial since it was simply cumulative of the testimony which Rodney Carson had previously given without objection.[19] *See Chestnut*, 511 Pa. at

19. As discussed previously, Rodney Carson testified that appellant told him that he was correct in his assertion that Brian Thornton was responsible for Bucky Davis' death and that he would "take care of this matter." (N.T. 1/12/93, 114). Carson also testified that co-defendant

174–75, 512 A.2d at 605–06 (prior testimony which jury could reasonably infer implicated defendant despite redaction was harmless where testimony was cumulative in regard to the defendant and it did not influence the outcome against defendant). *See Wharton, supra.* Accordingly, this claim must similarly fail.

(8) Appellant's final claim with respect to Carson's testimony is that a mistrial was warranted because Carson testified on direct that Thornton was incarcerated when he and his conspirators were planning revenge for Davis' death, and that he told James Anderson that he believed that they could have gotten one of Thornton's fellow inmates to kill Thornton. In response to this testimony, appellant objected and moved for a mistrial. (N.T. 1/12/93, 120–21). Instead of granting the mistrial motion, the court gave a cautionary instruction that evidence of other illegal conduct is inadmissible and that the jury should disregard the last remark. *Id.*

Despite appellant's argument that Carson's answer suggested that appellant considered ordering someone to murder Thornton while he was in prison, we disagree. Rather, Carson merely discussed what he perceived to be a possible plan to directly retaliate against Thornton, a plan that was not adopted, and made no mention that he shared his thoughts with appellant or that appellant was receptive to his suggestion that Thornton himself could be killed. Moreover, given that a jury is presumed to follow a trial court's instruction as well as the clarity of the instruction, we find that this instruction adequately overcame any impropriety. Accordingly, a mistrial was not warranted and this claim must fail.

### (b) *Christopher Anderson*

Appellant next alleges that there were two instances during Christopher Anderson's testimony which were so improper as to require the trial court to grant a mistrial.

James Anderson told him that appellant instructed him to murder the victim since he was the closest person to Brian Thornton. However, Carson informed James Anderson that he did not believe that the victim was that close to Thornton. Id. at 116.

 Appellant first contends that a mistrial was warranted when Christopher Anderson testified in response to cross-examination by appellant's counsel about what he did with the guns used in the murder because such statements implicated his involvement in another potential murder. After Anderson testified that they discarded the murder weapons, the following exchange occurred:

Q: Did you see the gun again?

A: Yes.

Q: When?

A: Two days later when I went back and got them. We took them and sold them, but before we sold them we was going to use them to hit—

(N.T. 1/14/93, 60). At that point, appellant's counsel objected and once again moved for a mistrial. The trial court denied the mistrial motion [20] and then instructed the jury that Anderson's answer was non-responsive and that the jury should disregard it since it was not admissible evidence. Appellant indicated his satisfaction with this instruction by neither objecting to it nor requesting further instructions. *See Morris, supra.* (failure to object to cautionary instruction indicates defendant's satisfaction).

Significantly, this statement did not directly implicate appellant; rather, it only indicated that Anderson was planning to commit another murder with another unidentified person or persons. Thus, appellant's argument that this statement implying Anderson's involvement in another crime served to also implicate appellant requires speculation on what the jury may have thought. The speculation that the jury may have interpreted this statement to refer to appellant will not, under these circumstances, overcome the well established presumption that a jury follows the trial court's instructions. Here, given the trial court's prompt cautionary instruction and the fact that appellant was not identified in this exchange, we find that a mistrial was not warranted. Accordingly, this claim

**20.** The trial court never ruled on the objection and appellant's counsel never pressed for a ruling on the objection.

must fail. *See Richardson, supra.* (possible prejudicial effect of a witness's reference to prior criminal conduct of defendant cured by immediate cautionary instruction).

■ Appellant next claims a mistrial was warranted when Christopher Anderson was cross-examined by co-defendant Brown's counsel about prior statements he had made about the victim's murder. When questioning Anderson about why he shot at the other people in the store, the following exchange occurred:

Q: I am going to read to you and ask if you remember saying this. "I had to shoot my gun at the store because if I came back and my gun wasn't fired, Aaron probably would have killed me." Do you remember saying that?

A: Yes

Mr. Rosen (prosecutor): It said would have me killed.

(N.T. 1/14/93, 148).

Appellant then objected and moved for a mistrial. The trial court denied the motion for a mistrial, but then gave a curative instruction to the jury that this only represented Christopher Anderson's state of mind and that what he is thinking at a particular moment is not evidence against anyone else. (*Id.* at 150–51). Appellant once again indicated his satisfaction with the curative instruction by neither objecting to the wording used by the court nor requesting any further instruction. *See Morris, supra.* After reviewing the circumstances in which this testimony was elicited and the fact that the trial court gave another in a long series of curative instructions on the limits of this testimony, we conclude that this instruction was proper and that it cured any prejudice that appellant may have suffered. This testimony did not deprive appellant of a fair and impartial trial. Accordingly, this claim must fail.

### (c) *Sharon Kennedy*

■ Appellant next contends that a mistrial was warranted because of the following testimony of Sharon Kennedy (the

sister of the deceased Bruce Kennedy) during appellant's counsel's cross-examination of her:

Q: So now, you were asked if you knew if Aaron Jones has a relationship with Neisha?

A: She told me that when they came to my mother's house on the day of my brother's funeral and told me that her baby [sic] father had something to do with my brother being killed, and if she found out the truth she would come forward with that information.

(N.T. 1/15/93, 75). Appellant alleges that Kennedy's non-responsive answer to the question asked by *his* counsel about whether she personally knew Neisha Witherspoon relayed prejudicial hearsay to the jury about who Ms. Witherspoon thought had killed the victim. As previously discussed, Neisha Witherspoon had a relationship with the victim prior to and after her relationship with appellant. Witherspoon was also the mother of one of appellant's children.

At sidebar, appellant's counsel moved for a mistrial. After denying appellant's motion for a mistrial because of this answer, the trial court struck the answer and once again gave a curative instruction that the jury was to disregard this statement since it was hearsay. (*Id.* at 78). Apparently, appellant was satisfied with the charge since he did not object or request further instructions. *See Morris, supra.* The trial court's prompt and comprehensive instruction to the jury was sufficient to cure any possible prejudice suffered from Kennedy's testimony. *See Commonwealth v. Brinkley,* 505 Pa. 442, 450–52, 480 A.2d 980, 985–86 (1984) (non-responsive answer which referenced polygraph examination did not merit mistrial when cured by prompt instructions to jury).

Furthermore, although Kennedy's answer was not responsive to appellant's question, the failure to grant a mistrial was harmless error since appellant's counsel chose to examine Neisha Witherspoon herself later during re-cross regarding her suspicion of appellant's involvement in the murder, there-

by reintroducing the previously stricken testimony to the jury.[21]

In light of these circumstances, we conclude that appellant was not prejudiced to the extent that he was deprived of a fair and impartial trial. Thus, the trial court did not abuse its discretion by declining to declare a mistrial. Accordingly, this claim must fail.

### (d) *Mark Brown*

Appellant next alleges that there were two instances during his witness Mark Brown's testimony which were so damaging as to require the trial court to grant a mistrial. Brown was called as a witness by the defense. Brown's testimony focused primarily on discrediting the Commonwealth's contention that the victim's murder was planned at the aforementioned August 17, 1990 meeting.

Appellant first contends a mistrial was warranted because the Commonwealth sought to impeach Brown with crimes beyond his *crimen falsi* convictions. *See Commonwealth v. Williams*, 524 Pa. 404, 573 A.2d 536, 538 (1990) (only *crimen falsi* convictions can be used to impeach a witness). Specifically, when asking about Brown's convictions, the Commonwealth inquired: "Now, you in fact—let's see, were convicted of robbery, robbery, robbery, three counts of robbery, assault, reckless endangering—" (N.T. 1/16/93, 148–49). Upon the prosecution's inclusion of non *crimen falsi* crimes in his question, each defense counsel immediately objected before Brown could answer and appellant's counsel moved for a mistrial. Despite the prosecution's reference to non-*crimen falsi* crimes, the trial court denied appellant's motion for a

---

21. The following exchange occurred during re-cross:

> Q: When you went to the Kennedy house afterwards, did you at that time have any belief in your mind that Aaron Jones was responsible for anything to do with Bruce Kennedy's death?
> A: No, I didn't.
> Q: Did you make any expression of any opinion to anyone at that time?
> A: No, I didn't.

(N.T. 1/16/93, 144).

mistrial. Although a curative instruction was offered, all counsel agreed that the court should not give a curative instruction so as not to highlight the assault and reckless endangerment crimes. (*Id.* at 149–51). While the prosecution's behavior was improper, we nevertheless do not find that a mistrial was warranted since the question was not answered. The jury was instructed in opening and closing that the prosecution's statements were not to be considered by the jury as evidence. Furthermore, there was overwhelming evidence of appellant's guilt introduced at trial and the error is harmless at best, especially in light of the extensive history of convictions of a *crimen falsi* nature. *See Commonwealth v. Tilley,* 528 Pa. 125, 595 A.2d 575 (1991) (trial court did not abuse discretion where no record in evidence of prior criminal record and trial court sustained defense objection and no answer elicited). Accordingly, this claim must fail.

Appellant next contends that a mistrial was warranted when the Commonwealth was allowed to cross-examine Brown regarding where he resided during appellant's trial. In response to the Commonwealth's question, Brown truthfully admitted that he was incarcerated. (N.T. 1/18/93, 34–36). Appellant then objected and moved for a mistrial. The trial court sustained the objection but denied the motion for a mistrial. Appellant suffered no prejudice from this because the trial court instructed the jury that testimony objected to by counsel and sustained by the court does not become evidence. *See Baker, supra.* (jury assumed to follow instructions on the law). Moreover, because Brown's residential status had no bearing upon *appellant's* guilt, and because appellant fails to explain in his brief how this truthful admission prejudiced appellant to the point that he was denied a fair and impartial trial, we find no mistrial was warranted. Accordingly, this claim must fail.

### (e) *Detective Walter Hoffner*

Appellant's final claim is that a mistrial was warranted because Detective Walter Hoffner testified during the penalty phase of the trial that appellant was convicted of

aggravated assault and "other charges" in connection with an incident at the Philadelphia Industrial Correctional Center. (N.T. 1/21/93, 45). Appellant objected and moved for a mistrial since he had only been convicted of aggravated assault. The Commonwealth agreed to check its records and correct any error. Upon doing so, it became clear that Hoffner had erred. Hoffner then clarified during direct examination that appellant was only actually convicted of aggravated assault. Appellant's counsel reinforced this correction during cross-examination. (*Id.* at 47, 50). Since the erroneous cite to appellant's record was quickly corrected during direct and once again clarified during cross-examination, we find a mistrial was not warranted since appellant did not suffer such prejudice from this incident that would have deprived him of a fair and impartial trial. *See Commonwealth v. Rivers*, 537 Pa. 394, 644 A.2d 710, 720 (1994) (jury being informed of "other charges" of which defendant was not convicted was harmless error when court immediately instructed jury that these convictions could not be considered). Accordingly, this claim must fail.

## V. *DOUBLE JEOPARDY*

■■■ Appellant's next claim is that his prior federal conviction for engaging in a continuing criminal enterprise barred his state prosecution and sentencing for murder because of double jeopardy considerations. As discussed previously at footnote 4, appellant was convicted prior to the instant trial in the United States District Court for the Eastern District of Pennsylvania of participating in a continuing criminal enterprise, in violation of 21 U.S.C. § 848,[22] and for conspiring to

---

**22.** Pursuant to 21 U.S.C. § 848(c), a person is engaged in a continuing criminal enterprise if:

(1) he violates any provision of this subchapter or subchapter II of the chapter [federal narcotics law] the punishment for which is a felony, and

(2) such a violation is part of a continuing series of violations of this subchapter or subchapter II of this chapter—

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a

possess cocaine with intent to distribute it, in violation of 21 U.S.C. §§ 841(a) and 846.[23] The Commonwealth admits that several of the overt acts alleged in the federal indictment were introduced as evidence in this murder trial to prove the motive for this murder. However, the victim's murder and the conspiracy surrounding his murder for which appellant was convicted in the instant matter had been deleted from the federal indictment and trial.

In evaluating appellant's claim that his state prosecution was barred by his federal prosecution, we must first determine if the present state prosecution offends either the Commonwealth or Federal constitutional protections against double jeopardy. The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const.amend. V. Article I, § 10 of the Constitution of this Commonwealth provides that "no person shall, for the same offense, be twice put in jeopardy of life or limb." With respect to these two constitutional provisions, this court has stated that Article I, § 10 of this Commonwealth's constitution affords protection co-extensive with that afforded under the Federal double jeopardy clause. *Commonwealth v. Klobuchir*, 486 Pa. 241, 254 n. 12, 405 A.2d 881, 887–88 n. 12 (1979). Thus, we turn to the Court's interpretation of the Federal double jeopardy clause for guidance.

In 1932, the United States Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), provided a test to apply in multiple punishment or

position of organizer, a supervisory position, or any other position of management, and
(B) from which the person obtains substantial income or resources.

**23.** Pursuant to 21 U.S.C. § 841(a)(1), "it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or process with intent to manufacture, distribute, or dispense, a controlled substance."

Pursuant to 21 U.S.C. § 846, a person engages in a conspiracy to distribute a controlled substance if he or she "attempts or conspires to commit any offense defined in this subchapter . . ."

multiple prosecution contexts to determine if the federal double jeopardy bar applies. This test, known as the "same elements" test, inquires into whether each offense contains an element not contained in the other. Double jeopardy attaches only if the prosecution is required to prove in the subsequent prosecution the same elements from the previous prosecution. *Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182. The vitality of this test was recently confirmed by the United States Supreme Court in *United States v. Dixon*, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993).[24]

Applying the "same elements" test to appellant, it is evident that the federal prosecution and state prosecution require proof of an element in one prosecution that is not required in the other prosecution. In order to convict appellant of maintaining a continuing criminal enterprise, the federal government had to show a violation of federal narcotics laws as part of a continuing series of violations in concert with five or more persons for whom appellant was the organizer or supervisor, and from which appellant derived substantial income or resources. *See United States v. Church*, 955 F.2d 688, 695 (11th Cir.), *cert. denied*, 506 U.S. 881, 113 S.Ct. 233, 121 L.Ed.2d 169 (1992); 21 U.S.C. § 848(1). In order to prove a conspiracy to possess with intent to distribute cocaine, the federal government had to show appellant was part of a conspiracy to possess cocaine with intent to distribute it, that appellant knew of the conspiracy, and that appellant was knowingly and voluntarily part of the conspiracy. *See United States v. Andrews*, 953 F.2d 1312, 1318 (11th Cir.), *cert. denied*, 505 U.S. 1227, 112 S.Ct. 3048, 120 L.Ed.2d 915 (1992); 21 U.S.C. § 846. Here, the Commonwealth trial required no such proof. The Commonwealth only had to prove the existence of a

24. In 1990, the United States Supreme Court in *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), added a second prong to the double jeopardy test known as the "same conduct" test. The same conduct test required examination of whether multiple criminal charges rested upon proof of the same underlying conduct. However, the second prong of the *Grady* test was expressly overruled in *Dixon*, 509 U.S. at ——, 113 S.Ct. at 2860. Thus, *Dixon* only requires an examination of the same elements or *Blockburger* test for double jeopardy purposes.

conspiracy to commit *murder* and the fact that the victim was murdered in furtherance of the conspiracy. The existence of a criminal conspiracy to commit murder is obviously different from a conspiracy to possess with intent to distribute cocaine or the existence of a criminal enterprise. *See Commonwealth v. Wetton,* 405 Pa.Super. 1, 591 A.2d 1067 (1991), *aff'd* 537 Pa. 100, 641 A.2d 574 (1994). Moreover, proof of the murder was not a predicate act in the federal prosecution and was not relevant to the federal charges. *See Commonwealth v. Scarfo,* 416 Pa.Super. 329, 611 A.2d 242 (1992) (not double jeopardy since different elements of proof required for Federal R.I.C.O. charge and state murder charge). Thus, the subsequent murder prosecution which forms the basis of this appeal was not barred under the federal constitutional doctrine of double jeopardy.

■■■ As for the Commonwealth constitutional claim, Mr. Justice John Flaherty recently noted that "the 'same elements' test of *Blockburger* has long been followed in this Commonwealth." *See Commonwealth v. Caufman,* 541 Pa. 299, 662 A.2d 1050 (1995) (double jeopardy did not bar Commonwealth's prosecution of vehicular homicide charge even though appellant had pled guilty to charge of driving at an unsafe speed). In light of *Dixon* and this Court's adoption of the *Blockburger* test, this Court's analysis herein of the federal constitutional double jeopardy claim also serves as the grounds for denying appellant's state constitutional double jeopardy claim.[25] Accordingly, appellant's Commonwealth and Federal constitutional double jeopardy claims must fail.

**25.** Appellant has failed to raise a double jeopardy claim under 18 Pa.C.S. § 111. Section 111 bars a prosecution in a state court by a former prosecution in another jurisdiction unless (1) the prosecution the Commonwealth proposes to undertake is not based on the same conduct for which the individual was prosecuted by the other jurisdiction; (2) the prosecutions require proof of a fact not required by the other; and, (3) the law defining the state offense is designed to prevent a substantially different harm or evil than the law defining the other jurisdiction's offense. *Commonwealth v. Traitz,* 528 Pa. 305, 311, 597 A.2d 1129, 1132 (1991). We recognize that an argument could be made that because Section 111's test contains the "same conduct" test announced by the United States Supreme Court in *Grady,* a test subsequently overruled in *Dixon,* that the Commonwealth's constitu-

## VI. *DISCOVERY VIOLATIONS*

Appellant next claims that he should receive a new trial because the trial court erred in admitting certain evidence regarding Christopher Anderson's attempt to avoid the police by staying in a hotel after the murder on the grounds that the Commonwealth violated Rule 305 of the Pennsylvania Rules of Criminal Procedure by not disclosing such evidence to the defense before trial. The specific evidence appellant complains should not have been admitted was the testimony of the hotel night auditor authenticating the hotel registration form and the registration form itself.

In evaluating defendant's claim, we must look at: (1) whether the discovery rules were violated; and, (2) whether the trial court abused its discretion in not excluding evidence under Rule 305(E) of the Rules of Criminal Procedure. Pursuant to Rule 305(E), if a discovery violation occurs:

> the court may order such party to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the defendant, or it may enter such other order as it deems just under the circumstances.

The trial court has broad discretion in choosing the appropriate remedy for a discovery violation. *Commonwealth v. Rodgers*, 500 Pa. 405, 412, 456 A.2d 1352, 1355 (1983). A defendant seeking relief from the discovery violation must demonstrate prejudice in order to be entitled to a new trial. *Id.*

With respect to the night auditor, appellant requested in a pre-trial discovery motion that the Commonwealth disclose a list of all of its witnesses. Appellant argues that the night auditor's testimony should not have been admitted because the Commonwealth did not disclose his identity as a

tional provision against double jeopardy provides greater protection than that of the federal constitution. *See Caufman, supra.* (Cappy, J. dissent). However, this Court need not address this issue since appellant does not raise a Section 111 claim. Moreover, even if the "same conduct" test was applied, appellant still would not be entitled to relief because the planning and murder of the victim in this case did not involve the same conduct relating to the distribution of controlled substances involved in the federal prosecution.

potential witness prior to trial. The night auditor was called by the Commonwealth to authenticate the hotel registration form that co-defendant Brown completed for Anderson's room on the night of the murder and to provide corroboration for Christopher Anderson's testimony that Brown drove him to the hotel following the murder, that the room was registered under the name of Brown, that Brown paid for the room in cash, and that Christopher Anderson stayed overnight in the room.

 With respect to the discovery of the names of witnesses, there is no requirement that the names of either eyewitnesses or other witnesses be disclosed by the Commonwealth under the mandatory disclosure provisions of Rule 305. *See* Pa.R.Crim.P. 305(B)(1). Rule 305(B)(2)(a), however, allows for the discretionary discovery of "the names and addresses of eyewitnesses." Pa.R.Crim.P. 305(B)(2)(a). Although not raised by appellant, we recognize that the trial court could have exercised its discretion and required disclosure of the name of the night auditor under Rule 305(B)(2)(d). Under Rule 305(B)(2)(d), the court, in its discretion, can order the Commonwealth to disclose "any other evidence specifically identified by the defendant, provided the defendant can additionally establish that its disclosure would be in the interests of justice." Pa.R.Crim.P. 305(B)(2)(d). However, appellant is not entitled to a new trial under this rule because disclosure of such evidence is left to the trial court's discretion and appellant never pressed the trial court for a ruling on this motion. Also, appellant was not prejudiced by the night auditor's testimony since he never requested a continuance when the night auditor was introduced and he was able to thoroughly cross-examine the night auditor.

Here, the trial court did not grant appellant's motion requesting disclosure of all witnesses. Thus, the Commonwealth was not obligated to disclose the night auditor's name and address to appellant.[26] *Commonwealth v. Colson*, 507 Pa. 440,

---

**26.** The court also notes that the night auditor's name was included in the lists of possible witnesses read to the jury venire panel during voir dire. (N.T. 1/6/93 at 22; 1/7/93 at 16; 1/8/93 at 80, 166). Thus, at the

463, 490 A.2d 811, 823 (1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986) (no error since Commonwealth disclosed all witnesses); *Accord, Commonwealth v. Dietterick,* 429 Pa.Super. 180, 187, 631 A.2d 1347, 1351 (1993), *appeal denied,* 538 Pa. 608, 645 A.2d 1312 (1994) (no discovery violation since none of witnesses who appellant claims were not disclosed were eyewitnesses to the crime); *Commonwealth v. Feflie,* 398 Pa.Super. 622, 636, 581 A.2d 636, 643 (1990), *appeal denied,* 528 Pa. 621, 597 A.2d 1151 (1991) (same). Moreover, appellant was aware of the hotel stay and could have interviewed the night auditor. *See Commonwealth v. Gelormo,* 327 Pa.Super. 219, 475 A.2d 765, 771 (1984) (Rule 305 is not a tool to be used by the defense to compel the Commonwealth to obtain evidence to which the defense had equal access). Thus, the trial court did not abuse its discretion by refusing to order a new trial under Rule 305 for the Commonwealth's failure to provide evidence to which the defense had equal access. Accordingly, we find no error on the part of the trial court in denying appellant relief on this basis.

Appellant next claims that the Commonwealth should not have been able to admit into evidence the hotel registration form since it did not turn over a copy of it to the defense prior to trial. In appellant's pre-trial discovery motion, appellant requested disclosure of all tangible objects, including documents, photographs, fingerprints or other tangible evidence. Disclosure of these requested items is mandatory under Rule 305(B)(1)(f) of the Rules of Criminal Procedure.

Although the Commonwealth asserts that it turned this registration form over to the defense before trial, it is unclear from the trial court's opinion regarding appellant's post-trial motions or the record whether a finding was made regarding whether the Commonwealth disclosed this form prior to trial.

very least, appellant was made aware of the night auditor's possible testimony before trial began and he was not prevented from inquiring further before trial into the testimony to be presented by the night auditor if appellant had so desired.

Obviously, this claim would be rendered baseless had the Commonwealth turned over the form before trial.

What is clear from the record is that the Commonwealth turned over the hotel registration form, at the latest, on the morning of the night auditor's testimony and that appellant did not request a continuance when the trial court ruled that this evidence was admissible. However, even if such a discovery violation occurred, it does not automatically entitle appellant to a new trial. Appellant and his co-defendants obviously reviewed this form prior to the night auditor's testimony since the night auditor was cross-examined by defense counsel extensively regarding the form. (N.T. 1/15/93, 25–45). Appellant fails to develop how a more timely disclosure would have affected his trial strategy or how he was otherwise prejudiced by the alleged late disclosure of this form. *See Commonwealth v. Chambers*, 528 Pa. 558, 573–75, 599 A.2d 630, 636–38 (1991), *cert. denied*, 504 U.S. 946, 112 S.Ct. 2290, 119 L.Ed.2d 214 (1992) (not error for trial court to refuse to grant a mistrial for disclosure of evidence until after trial began where appellant cannot demonstrate prejudice). Moreover, appellant's failure to request a continuance when the hotel registration form and the night auditor's testimony were disclosed compels this Court to conclude that counsel believed that no additional time or strategy was needed to prepare for cross-examination of the witness. Appellant cannot simply sit back and rely upon the Commonwealth to obtain evidence to which appellant had equal access. *See Gelormo, supra.* Accordingly, we conclude that appellant has not demonstrated the appropriate degree of prejudice required under Rule 305(E) for us to find that the trial court abused its discretion. Therefore, a new trial is not warranted.

## VII. *PROSECUTORIAL MISCONDUCT*

In his next allegation of error, appellant argues that the prosecutor committed prosecutorial misconduct by making three improper remarks during his closing argument at trial and by making one improper remark during his closing argument during the penalty phase. In reviewing a claim of

improper prosecutorial comments, our scope of review is limited to whether the trial court abused its discretion by ruling that the Commonwealth did not act improperly. *Commonwealth v. D'Amato*, 514 Pa. 471, 490, 526 A.2d 300, 310 (1987). Generally, comments by a prosecutor do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict. *Commonwealth v. D'Ambro*, 500 Pa. 303, 309–10, 456 A.2d 140, 144 (1983).

The first statement at trial which appellant contends was improper was where the prosecutor in closing argument referred to Sharon Kennedy's hearsay testimony that Neisha Witherspoon told her "about the defendant being responsible for Kennedy's murder." As previously noted, the following testimony by Sharon Kennedy during the trial was stricken:

Q: So now, you were asked if you knew if Aaron Jones had a relationship with Neisha?

A: She told me that when they came to my mother's house on the day of my brother's funeral and told me that her baby [sic] father had something to do with my brother being killed, and if she found out the truth she would come forward with this information.

(N.T. 1/15/93, 75). This Court has reviewed the record and it fails to find any statement by the prosecutor which referenced this stricken testimony of Sharon Kennedy. Significantly, appellant fails to cite to a page of the transcript where the prosecution's allegedly improper statement occurred. Accordingly, this claim must fail.

Appellant next claims that the Commonwealth's following comments regarding the testimony of appellant's witness Mark Brown were improper:

You know it's not for me to say whether a defense witness got up and lied about something, that's for you to determine. I am not allowed and I won't stand here and call anybody a liar or say he's telling untruths. But if you find

that this Ami, this Mark Brown was lying, ask yourself this question, ask yourself why did they put him up, when somebody had nothing to do with this—if Aaron Jones was innocent, would he put that witness up on the witness stand to lie to us about that?

(N.T. 1/19/93, 75). We note that prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair. *Commonwealth v. Marshall*, 534 Pa. 488, 509, 633 A.2d 1100, 1110 (1993). Moreover, in order to evaluate whether the comments were improper, we must look at the context in which they were made. *Commonwealth v. Carpenter*, 533 Pa. 40, 48–49, 617 A.2d 1263, 1267 (1992).

During direct, Mark Brown testified that he could not have attended the August 17, 1990 meeting where it was decided that the victim would be killed since Brown was serving a sentence in a half-way house for a prior conviction. During cross-examination, Brown also testified that he was unaware of appellant's association with the JBM and that he did not know any of the other alleged JBM members who were supposedly in attendance at the meeting. However, the Commonwealth impeached Brown with an audiotape obtained pursuant to a federally-authorized wiretap in which Mark Brown referred to co-defendant Samuel Brown by the nickname of "Magic." The audiotape also revealed Mark Brown's knowledge of appellant's affiliation with the JBM as well as his knowledge of the other people who attended the August 17, 1990 meeting. Thus, upon further cross-examination, Brown admitted to the court that his prior testimony in response to the Commonwealth's questions was false.

After the prosecution commented regarding Brown's false testimony in its closing, appellant's counsel objected and moved for a mistrial on the basis that the prosecution's comments improperly shifted the burden of proof onto appellant. In response, the trial court denied the motion but gave the following cautionary instruction:

Members of the jury, I am going to give you a short instruction now. As I told you before, its not your—

responsibility of a defendant to call any witnesses. It's the responsibility of the Commonwealth to prove guilt beyond a reasonable doubt. But once a witness is called by a defendant, then the Commonwealth has the right to cross examine that person and challenge that person's credibility, and that is the limit of the argument before you.

(N.T. 1/19/93, 79).

Appellant's counsel never objected to this instruction or requested further instructions, thereby indicating his satisfaction. *See Morris, supra.* Further, we find that the Commonwealth's comments did not shift the burden of proof to appellant. Assuming *arguendo* that a person could reasonably interpret these comments as shifting the burden of proof to the defense, we find that the trial court's prompt and accurate cautionary instruction amply clarified that the Commonwealth always maintains the burden of proving appellant's guilt. Thus, after considering the totality of the circumstances, we find that the trial court's curative instructions cured any prejudice caused by the alleged prosecutorial misconduct.[27]

It is well settled that as long as a prosecutor does not assert his personal opinions, he or she may, within reasonable limits, comment on the credibility of a defense witness. *Commonwealth v. Russell,* 459 Pa. 1, 9, 326 A.2d 303, 307 (1974); *Commonwealth v. Brooks,* 454 Pa. 75, 78, 309 A.2d 732, 733 (1973). Here, the prosecutor did not assert his personal opinion as to Mark Brown's testimony. Instead, the prosecutor commented on Mark Brown's credibility. These comments were especially proper since appellant's own counsel remarked negatively on Mark Brown's credibility in his closing argument by stating: "If Mark Brown was the only witness, forget it. I am not even going to waste my breath." Further, this Court finds that these comments did not have the unavoidable effect of prejudicing appellant by inflaming the jury or by

---

27. We also note that the trial court instructed the jury in its opening and closing instructions that counsel's statements were not evidence. This instruction, coupled with the curative instruction, convinces us that no new trial is warranted as the jury is presumed to follow instructions. *See Baker, supra.*

forming a fixed bias or hostility in the jury's minds toward the defendant so that they could not weigh the evidence objectively, especially where the witness admitted to falsely testifying. Thus, this claim of prosecutorial misconduct must fail.

Appellant's third claim based on the prosecutor's closing argument in the guilt phase is that the prosecutor improperly argued that one of the reasons appellant ordered the victim's murder was because the victim had a relationship with the mother of one of his sons.[28] It is well settled that a prosecutor's remarks are proper if they are supported by the evidence or they contain inferences which may be reasonably derived from the evidence. *Commonwealth v. Barren,* 501 Pa. 493, 498–99, 462 A.2d 233, 235 (1983).

Here, evidence revealed that the victim was intimately involved with Neisha Witherspoon, the mother of one of appellant's sons, for some time before and sometime after her involvement with appellant. Evidence also showed that the appellant rejected protests by other JBM members that the victim was not close enough to Thornton so that Thornton would heed the warning message that Leroy Davis' death was not condoned by the JBM leadership. A reasonable inference can be drawn from this evidence that appellant had an additional ulterior motive to order the victim's death because appellant's displeasure with the victim's sexual relationship with the mother of his child. Thus, the Commonwealth properly argued that based on the evidence presented that appellant killed "two birds with one stone" by ordering the victim's murder to appease the Leroy Davis faction of the JBM for his death and to eliminate the victim's relationship with the mother of appellant's child. Accordingly, this claim must fail.

Finally, appellant contends that the following remarks during the prosecutor's closing at the penalty phase were improper:

**28.** Evidence of motive, intent, plan, design, ill will or malice is relevant in a criminal case. *Commonwealth v. Gwaltney,* 497 Pa. 505, 514, 442 A.2d 236, 241 (1982).

And ladies and gentlemen, now standing here at this point, at this stage in the trial of the sentencing phase, I am going to hold you to your oaths on the bible, because, ladies and gentlemen, in this case as to this defendant, especially as to this defendant, the law and facts call for the death penalty.

(N.T. 1/21/93 at 81). Appellant objected to this statement and moved for a mistrial claiming that such remarks improperly compared appellant's culpability for the murder to that of his co-defendants. The motion for a mistrial was denied. However, the trial court gave the following limiting instruction:

Members of the jury, you are directed that Aaron Jones is before you for the purpose of fixing a penalty and you're to consider his actions with regard to fixing the penalty and not the other two defendants that were also on trial.

(N.T. 1/21/93, 82–83).

No further instruction was requested by appellant and no motion for a mistrial was made after the instruction was given, thereby suggesting that appellant's counsel was satisfied with the instruction. *See Morris, supra.* Nevertheless, during the penalty hearing, the prosecutor is accorded reasonable latitude and may employ oratorical flair in arguing for a sentence of death. *Commonwealth v. Marshall,* 534 Pa. 488, 509, 633 A.2d 1100, 1110 (1993). As discussed *supra,* a prosecutor's remarks must be evaluated for possible prejudicial effect in the context in which they occur. *Commonwealth v. Carpenter,* 533 Pa. 40, 48–49, 617 A.2d 1263, 1267 (1992).

Here, appellant's penalty hearing was separate from the other two co-defendants and the prosecutor's remark did not expressly mention the co-defendants. The trial court gave a prompt and accurate cautionary instruction to the jury that it was not to consider the relative culpability of the other defendants in arriving at the appropriate sentence for appellant. Moreover, the trial court also instructed the jury in its opening and closing instructions that counsel's statements were not evidence. After considering the totality of the circumstances, we find that any prejudicial effect, if any, from the prosecution's statement was cured by the trial court's

cautionary instructions. *See Commonwealth v. Talley*, 456 Pa. 574, 578, 318 A.2d 922, 924 (1974) (any prejudice from prosecutor's closing remarks can be overcome by trial court's jury instruction). Thus, since the prosecutor's remark did not explicitly compare appellant to the other two co-defendants and the trial court instructed the jury on its role for sentencing purposes, we conclude that this claim of prosecutorial misconduct must fail.

## VIII. *JURY INSTRUCTIONS*

■ Appellant next alleges that the trial court erred in its jury instruction on accomplice testimony because it allowed the jury to determine whether Christopher Anderson and Rodney Carson were accomplices to the victim's murder instead of instructing the jury as a matter of law that Christopher Anderson and Rodney Carson were accomplices.[29] Appellant asserts that more than anyone else, it was the testimony of Christopher Anderson and Rodney Carson that implicated him in this murder conspiracy. Since these two witnesses admitted their participation in the murder, appellant asserts that the failure to give an instruction that these two were accomplices as a matter of law undermined the effectiveness of the corrupt source instruction delivered by the trial court.

During its jury charge, the trial court gave the following accomplice charge:

If you believe that a person testifies as a Commonwealth witness, you have to decide whether or not you believe that person was an accomplice in the commission of the crime. Special rules may apply for you to consider a person's testimony. First, you must decide whether or not you believe that the person who testified, such as Mr. Anderson or Mr. Carson, himself or either one of them joined with any other person in committing the particular crime for which

**29.** When Christopher Anderson testified as to the details of the conspiracy and murder, he revealed his own involvement in the victim's death. However, contrary to appellant's assertion and that of the trial court, Rodney Carson never admitted to being an accomplice. However, one could infer that Carson was an accomplice from the evidence.

this defendant is charged. Decide whether or not you believed the witness admitted or did not admit the participation in the crime. You have to then make your judgment as to whether or not a person is an accomplice. It is up to you to decide that.

The trial court, after defining what constitutes an accomplice, then charged:

Experience shows that after being caught in the commission of a crime, a person may falsely name others because of a corrupt or wicked motive. On the other hand, such a person may tell the truth about how he and others committed the crime together. In deciding whether or not to believe a particular witness, please be guided by these principles:

First, decide whether or not the testimony from the person you heard was in fact the testimony of an accomplice. If you decide that the person is an accomplice, then his testimony should be looked upon as coming from a polluted source. Second, examine testimony closely and accept it only with caution and care. Third, consider whether the person's testimony that a particular defendant committed a crime was supported in whole or in part by evidence other than this testimony. If it's supported by independent evidence, it's more dependable. You may find a defendant guilty even though it's not supported by independent evidence.

(N.T. 1/19/93, 117–120).

When reviewing a challenge to a part of a jury instruction, the Court must review the jury charge as a whole to determine if it is fair and complete. *Commonwealth v. Saunders*, 529 Pa. 140, 602 A.2d 816 (1992). A trial court has broad discretion in phrasing its charge and can choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error. *See Commonwealth v. Prosdocimo*, 525 Pa. 147, 150, 578 A.2d 1273, 1274 (1990).

In this instance, the trial court, rather than declaring to the jury that Christopher Anderson and Rodney Carson were accomplices as a matter of law, let the jury decide if these two men were accomplices. Appellant, relies on *Commonwealth v. Bricker*, 525 Pa. 362, 581 A.2d 147 (1990), *Commonwealth v. Sisak*, 436 Pa. 262, 259 A.2d 428 (1969) and *Commonwealth v. Watts*, 348 Pa.Super. 224, 501 A.2d 1152 (1985) to support his contention that this was error. However, these cases are inapposite to the present case since those cases concern a trial court's refusal to give any type of accomplice instruction. Also, appellant does not, and cannot, claim that the trial court's instruction to the jury was an inaccurate instruction to the jury on how to determine if Christopher Anderson or Rodney Carson were accomplices to the victim's murder. Moreover, when reviewing the instruction given as part of the entire charge, the court clearly instructed the jury on the care and scrutiny to be given the testimony of an accomplice before it is accepted as credible. *See Commonwealth v. Banks*, 447 Pa. 356, 360–61, 285 A.2d 506, 508–09 (1971) (not error for trial court to let jury determine whether witness was an accomplice instead of declaring it as a matter of law, since instruction, taken as a whole, clearly instructed jury as to care to be used when considering witness' testimony). Thus, the trial court did not err in its accomplice instruction to the jury.

Assuming *arguendo*, that the trial court should have instructed the jury that Christopher Anderson and Rodney Carson were accomplices as a matter of law, a new trial is still not warranted since any resulting error was harmless. Here, both Christopher Anderson and Rodney Carson testified pursuant to plea agreements. Because of these plea agreements, the trial court instructed the jury to closely scrutinize their testimony since it may have been motivated by an expectation of leniency. (N.T. 1/19/93, 113–115). Thus, any possible error arising from the accomplice charge was harmless since the jury was clearly instructed that it had to closely scrutinize their testimony before accepting it. Accordingly, this claim must fail.

## IX. *USE OF PEREMPTORY CHALLENGES TO EX-CLUDE FEMALES*

Appellant next claims that the Commonwealth violated his equal protection rights by improperly exercising its peremptory challenges to exclude female venirepersons from the jury panel. In *J.E.B. v. Alabama ex rel. T.B.*, —— U.S. ——, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), the United States Supreme Court held that the intentional use of peremptory strikes by the prosecutor during jury selection to strike prospective jurors solely on the basis of gender violates the equal protection clause. As with race-based *Batson* [30] claims, a party alleging gender discrimination must make a *prima facie* showing of intentional discrimination before the party exercising the challenge is required to explain the basis for the strike. *Id.* at ——, 114 S.Ct. at 1429. Thus, we look to the test established in *Batson* and its progeny to determine if a *prima facie* case was developed, and if so, whether the trial court abused its discretion in ruling that gender based discrimination has occurred.

A defendant must first demonstrate a *prima facie* case that the prosecutor discriminated on the basis of gender by providing evidence of the use of peremptory challenges. This requires that the defendant make a record specifically identifying:

(1) the gender of all the venirepersons in the jury pool;

(2) the gender of all venirepersons remaining after challenges for cause;

(3) the gender of those removed by the prosecution; and,

(4) the gender of the jurors who served and the gender of jurors acceptable to the Commonwealth who were stricken by the defense.

After such a record is established, the trial court must consider the totality of the circumstances to determine whether challenges were used to exclude venirepersons on account of their gender. If the trial court finds in the affirmative, it may

**30.** *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

then require the prosecutor to explain his or her reasons for the challenge. *Commonwealth v. Spence*, 534 Pa. 233, 246, 627 A.2d 1176, 1182–83 (1993) (race claim), *Accord, Batson, supra.* A finding by the trial court as to an absence of discriminatory intent must be given great deference on appeal. *Commonwealth v. Young*, 536 Pa. 57, 637 A.2d 1313, 1319 (1993).

Here, appellant failed to create an adequate record at trial as required by *Spence* in that he failed to make a record of the gender of all the venirepersons in the jury pool, the gender of all venirepersons remaining after being stricken for cause, and the gender of jurors who were acceptable to the Commonwealth that were stricken by the defense. Appellant therefore fails to make an adequate record in the present appeal. In this instant appeal, appellant only identifies the number of female venirepersons struck by the Commonwealth. This information alone fails to satisfy the requirements for establishing a *prima facie* case.

Nevertheless, this Court has conducted an independent review of the limited record available in order to glean whether there is any merit to appellant's claim. The record shows that this was not a gender sensitive case. The record also shows that twenty-eight (28) female venirepersons remained after excusals for cause were granted by the trial court. Of these twenty-eight, the Commonwealth used its peremptory challenge on fifteen (15) and the defendants used their peremptory challenges on seven (7). Appellant was ultimately convicted by a jury comprised of six women and six men, with two women acting as alternates. Moreover, the trial court, after conducting its own independent review of the limited record, concluded that no gender based discrimination existed in the Commonwealth's usage of its peremptory challenges. Based on this Court's independent review of the totality of the circumstances, we simply cannot disagree with the trial court's findings. Thus, we conclude that appellant has failed to establish sufficient facts or circumstances which would warrant a disturbance of the trial court's finding that no

purposeful discrimination based on gender occurred.[31] Accordingly, this claim is rejected.

## X. AGGRAVATING CIRCUMSTANCES AT PENALTY HEARING

The final claim raised by appellant is that three aggravating circumstances not found by the jury should not have been allowed to be presented to the jury because they were not supported by sufficient evidence.[32] Appellant asserts that the presentation of these three aggravating circumstances inured to his prejudice since it branded appellant as the alleged leader of the JBM rather than the victim's murderer.

A death sentence will only be reversed if the jury relied on an unsupported and, therefore, improper aggravating circumstance in rendering its penalty phase verdict. *Commonwealth v. Williams*, 537 Pa. 1, 24, 640 A.2d 1251, 1263 (1994). However, reversal of a defendant's sentence is not

**31.** Even if appellant could establish an inference of purposeful discrimination, the Commonwealth has listed gender neutral reasons for each of its strikes made against female venirepersons. These reasons include bias against police, antipathy towards the death penalty; negative experiences with the criminal justice system, occupations, education, medical problems, and relationships to persons arrested or convicted of crimes. These reasons would have been found to be sufficient to defeat a purposeful discrimination claim. *See J.E.B.*, —— U.S. at ——, 114 S.Ct. at 1430 (when an explanation is required for strike, it need not rise to the level of a "for cause" challenge); *See also Commonwealth v. Griffin*, 537 Pa. 447, 644 A.2d 1167, 1173 (1994) (permissible to challenge on reluctance to impose death sentence, youth, and brief employment history); *Commonwealth v. Jackson*, 386 Pa.Super. 29, 55–56, 562 A.2d 338, 351 (1989), *appeal denied*, 525 Pa. 631, 578 A.2d 926 (1990) (permissible to challenge niece of man arrested since evidences potential bias against police); *Commonwealth v. Correa*, 423 Pa.Super. 57, 62–63 n. 5, 620 A.2d 497, 501 n. 5, *appeal denied*, 536 Pa. 638, 639 A.2d 24 (1993) (permissible to challenge based on fact that the venirepersons's son had been arrested); *Commonwealth v. Phillips*, 411 Pa.Super. 329, 339, 601 A.2d 816, 821 (1992) (permissible to challenge person employed as drug counselor).

**32.** Out of the four (4) aggravating circumstances argued by the Commonwealth during the penalty phase, the jury only found the aggravating circumstance that appellant was convicted of another federal or state offense which had a possible sentence of life imprisonment or death pursuant to 42 Pa.C.S. § 9711(d)(10). Appellant has not raised any challenge to this aggravating circumstance.

warranted by submitting an aggravating circumstance to the jury if the jury does not find beyond a reasonable doubt the existence of that improper aggravating circumstance in rendering its verdict of death since such error is harmless. *See Williams*, 537 Pa. at 24–25, 640 A.2d at 1263 (harmless error to allow jury to consider unsupported aggravating circumstance of killing by torture where jury did not base sentence on this circumstance; rather jury found evidence supporting the aggravating circumstance that the killing occurred during felony); *Commonwealth v. Christy*, 511 Pa. 490, 507–08, 515 A.2d 832, 840–41 (1986), *cert. denied*, 481 U.S. 1059, 107 S.Ct. 2202, 95 L.Ed.2d 857 (1987) (appellant suffered no prejudice when trial court allowed submission of aggravating circumstance not adequately supported by the evidence when jury did not find that aggravating circumstance).

Here, three aggravating circumstances challenged by appellant were not unanimously found by the jury from the evidence presented. Even if *Williams* did not apply, appellant would still not be entitled to relief since a review of the penalty phase shows that these claims are meritless. Appellant first argues that there was insufficient evidence to submit to the jury the aggravating circumstance that his conduct knowingly created "a grave risk of death to others." 42 Pa. C.S. § 9711(d)(7). Here, evidence showed: that appellant ordered Christopher Anderson and James Anderson to murder the victim at his store; that Christopher Anderson shot at store employees while they attempted to flee during the murder; and, that bullets sprayed from the perpetrators' machine guns intended for the victim could have ricocheted, allowing a jury to infer that they could have hit the other employees. This evidence was certainly sufficient for the jury to have concluded that appellant knowingly created a "grave risk of death to others." *See Commonwealth v. McNair*, 529 Pa. 368, 375–76, 603 A.2d 1014, 1018 (1992) (firing shot into crowded street at specific people who were running for safety sufficient evidence to support (d)(7)); *Commonwealth v. Smith*, 518 Pa. 15, 45, 540 A.2d 246, 260 (1988) (sufficient

evidence to support (d)(7) where other people present on porch with victim could have been struck by errant ricochet).

Appellant next argues that insufficient evidence existed to allow the aggravating circumstance that he possessed a significant history of felony convictions involving the threat or use of violence (42 Pa.C.S. § 9711(d)(9)) because he asserts that his federal conviction for conspiracy and engaging in a continuing criminal enterprise do not qualify as such a felony. Appellant raises numerous sub-issues in this claim. The first sub-issue raised concerns the admissibility of Trooper Ansel's testimony at the sentencing hearing. During Appellant's sentencing, Trooper Ansel, based on his own personal observation of appellant's federal trial and his review of the federal record, summarized the evidence at appellant's federal trial in order to support the Commonwealth's assertion that the acts underlying appellant's federal convictions were acts of violence. Trooper Ansel's summarization was based upon testimony presented at appellant's federal trial for which appellant was present, represented by counsel, and afforded the opportunity to extensively cross-examine the witnesses who testified against him. Appellant does not challenge the veracity of Trooper Ansel's summarization. Instead, appellant's sole claim is that this summarization was inadmissible because it constituted hearsay. Even if Trooper Ansel's summarization was hearsay, we find that its admission constitutes harmless error since the jury did not find the existence of this aggravating circumstance. *See Williams, supra, Christy, supra.*

As for the sufficiency of the evidence itself, when attempting to prove Section 9711(d)(9), the Commonwealth may place the underlying facts of the prior convictions before the jury so that jurors may assess the weight to be given to the factors. *Commonwealth v. Rivers*, 537 Pa. 394, 415, 644 A.2d 710, 720 (1994). Here, the evidence from the federal trial showed: that appellant was the leader of the JBM and that the JBM distributed large quantities of cocaine; that the JBM used violence to enhance its hold on the drug market in Philadelphia; that appellant ordered acts of violence, including the

killing of other people. Based on this, we conclude that sufficient evidence existed to present this aggravating circumstance to the jury.

Appellant also contends that the trial court should have instructed the jury that even though acts of violence were listed as overt acts in the federal indictment and introduced into evidence at appellant's federal trial, it does not mean that the federal jury based its conspiracy conviction on these violent acts or that the acts constituted elements of the crimes charged. Here, the trial court declined to give such an instruction and allowed the jury to decide what the federal charges involved. Even if the court erred in not explaining the federal charges as appellant requested, such error was harmless because the trial court allowed appellant to make this argument to the jury in its penalty phase closing (N.T. 1/21/93, 107–111) and the jury failed to find this aggravating circumstance.

Appellant's last contention on aggravating circumstance (d)(9) is that certain acts included in the federal conviction could not be considered by the jury because they occurred after the crimes charged in this state prosecution. This contention is without merit since it is well established that convictions for offenses occurring after the subject offense are admissible at the penalty phase to establish aggravating circumstances. *Commonwealth v. Murphy*, 540 Pa. 318, 657 A.2d 927, 935 (1995).

Appellant's final penalty phase claim concerns whether sufficient evidence existed to allow the jury to consider the aggravating circumstance that the victim's murder was related to or resulted from association with drug trafficking and the killing was done to advance that trafficking pursuant to 42 Pa.C.S. § 9711(d)(14). Here, the evidence showed: that appellant was the leader of the JBM; that the JBM was an organization which existed for the purpose of trafficking drugs; and, that it used violence to ensure that individuals distributed drugs supplied by the JBM. Based on this evidence, a jury could have reasonably inferred that the victim's

murder was ordered to promote the JBM's drug activities and to ensure loyalty to the JBM's purpose. Accordingly, the issue was properly presented to the jury.

## XI. *REVIEW OF SENTENCE*

██ Finally, pursuant to 42 Pa.C.S. § 9711(h)(3), this Court has a duty to affirm the sentence of death unless we determine that:

> (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;
>
> (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or
>
> (iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

42 Pa.C.S. § 9711(h)(3).

After reviewing the record below, we conclude that the sentence imposed was not the product of passion, prejudice or any other arbitrary factor. In addition, we further find that the aggravating circumstance found by the jury that defendant had been convicted of another federal or state offense for which a sentence of life imprisonment was imposable is supported by the record. Here, appellant was the leader of the JBM (discussed *supra* at n. 8) and his involvement as leader of the JBM resulted in his federal conviction of engaging in a continuing criminal enterprise. At the same time, appellant was convicted of conspiracy and possession of cocaine with intent to distribute. Since appellant was found to be the leader of the continuing criminal enterprise, the federal court was required by 21 U.S.C. § 848(b) to sentence appellant to life imprisonment. Thus, evidence clearly supported a finding of 42 Pa.C.S. § 9711(d)(10).

Furthermore, in accordance with *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 961 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983), we have

reviewed the sentencing data compiled by the Administrative Office of the Pennsylvania Courts pertaining to similar cases and conclude that the sentence of death imposed upon appellant is not disproportionate. *See Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700, 707–08, *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984).

Accordingly, we affirm the verdict and the sentence of death imposed upon appellant, Aaron Jones, by the Court of Common Pleas of Philadelphia County.[33]

CAPPY, J., concurs in the result.

MONTEMURO, J., participates by designation as a senior judge as provided by Rule of Judicial Administration 701(f).

---

**33.** The Prothonotary of the Supreme court is directed to transmit, as soon as possible, the complete record of the case *sub judice,* including the record of trial, sentencing hearing, imposition of sentence and review by this Court to the Governor of Pennsylvania. 42 Pa.C.S. § 9711(i).